Good morning, Your Honor. May it please the Court, Robert Thornton on behalf of the appellants. Your Honor, the facts in this case, the key facts, are really undisputed. We have, the Fish and Wildlife Service, proposed to list this species on the basis of two fundamental premises. First, that this animal was found in only one small location in Kern County, and secondly, that it's a distinct subspecies of ornate shrew, and that that subspecies can be identified on the basis of its coloration, or what the biologists refer to as morphological characteristics. The service solicits public comment on the basis of those premises. It closes the public comment period, and then after the close of the public comment period, three new studies become available that, in our view, provide significant new information that the public should have had an opportunity to review and comment upon. Indeed, the District Court found that we had made a prima facie showing below that the new studies did provide unique new information. Now, these were not just any kind of study. One of the studies was, in fact, a formal status review commissioned by the Fish and Wildlife Service itself. So these were the service's own outside experts who were commissioned to do a study to review the status of the species. And lo and behold, that study, that status review, concluded that this animal was not endangered. It reached that conclusion because, in contrast to the populations of the animal in Kern County, and identified several other areas where they said the shrew could be found, and the study reviewed the taxonomic information, the characterization of the subspecies, and concluded from the available information that the characterization of this animal as a separate subspecies was unsettled. Now the second study was a so-called morphological study, or a study of physical ornate shrew specimens. This animal is a, the lake shrew is a subspecies of a larger species of ornate shrew, which is found from Baja, Mexico, to Northern California, through Northern California. That study by Dr. Maldonado refuted the essential bases of the proposed rule that you can identify subspecies of shrews on the basis of their coloration. That study looked at 560 specimens and concluded that, basically, you couldn't identify subspecies on the basis of looking at morphological characteristics. In fact, one of the analyses, and it's cited in the paper, showed a 50% chance of accurately predicting the subspecific designation for a shrew based on its physical characteristics. Now what that means is that the odds of predicting the correct subspecies of a shrew are worse than flipping a coin. So that indicates that coloration or physical characteristics, the shape and size of the animals, is a very, very poor predictor of what subspecies to place the animal in. Now the third study... Before you leave that, though, you touched on a point that interested me, which is that the agency did consider the Maldonado study in its final report, as I read it, correct? The agency did cite multiple times to the two Maldonado studies in the final rule correction on it. Yes, you disagree with their interpretation of it, but the agency considered it. The agency considered it, but our fundamental argument, Your Honor, is that the Administrative Procedure Act and the Endangered Species Act and the holdings of this Court are to the effect that important new information must be made available for public review and comment. Important information or critical information? I don't know that there's a legal distinction, Your Honor, but important, critical, unique... Well, I know which one the cases use, and I know which one you used, and you're assuming they're the same. I think important, critical information, I think the line of cases that we cited, Your Honor, clearly suggests that, for example, in the Washington Trollers' decision of this Court, the important information that was found by the Court to be the reason why the agency violated the Procedure Act in that instance was the underlying data that the agency was relying upon, because the reason the Court pretty self-evident and common sense that when you're talking about data, and the data plays an important role in the decision, the public has to have an opportunity to review that data. We didn't have an opportunity to review the data in this case because the data wasn't available until after the comment period was closed. And in the case of the status review, the Fish and Wildlife Service, having commissioned the study themselves, having known that the study was ongoing, amazingly, never disclosed to the public in the proposed rule that the status review had even been commissioned. We made requests for all the information in which the service had relied at the time of the proposed rule, and they failed to provide us any notice of the status review at all, didn't disclose its existence, and indeed, in the final rule, never even disclosed that the status review had recommended against listing the species. Well, Idaho Farm Bureau says the new information must be critical. That's the only issue I'm raising. You continue to use important, and to me, there's a big difference between important and critical. It may not be to you, to anyone else, but once we use the term critical, and you use the term important, it raises a flag in my mind as to whether the issues you're raising are really critical or just important. Well, I think these are critical issues, Your Honor. Certainly, the status review's conclusion that the species was not endangered, that goes fundamentally to the underlying decision under the statute. Similarly, the question of whether this animal is a distinct subspecies or not is critical information in the context of the Endangered Species Act, because whether an animal is endangered throughout its range fundamentally depends on what is the range of this animal. If the what we're getting at is whether this is critical to the agency's determination as distinguished from important information they should consider. Now, how is this critical to the agency's determination? That's what we need to find out. I would say, Your Honor, that it is you look at the final rule, and you look at what did the agency appear to reference to support the decision. By the time the agency got to the final rule, they acknowledged two important things. They acknowledged, A, no, this species is indeed more widespread than we had assumed in the proposed rule. It's found in more than simply one location. And you feel that was critical? We think that is very critical. It went from 13 to 30 in the whole world, and that's critical? Your Honor, I think there is, there have been some, I won't say misunderstanding or mischaracterization of the population information. None of the information in the record provides what anyone would call a population estimate. In fact, the status review specifically discusses this. These are what's known in the trade as presence-absence studies. There was not any kind of what biologists would refer to as mark-recapture studies where you actually do replicated studies to actually come up with a population estimate. Yeah, they could have gotten, perhaps there's something better. But what they did have before them, if I understand it correctly, is you're wrong, there aren't just 13, 15, there are 30. If that's what was before them, it doesn't strike me as being critical as to whether or not the decision should be different. How do you respond to that? Our response, Your Honor, is that when the service said, I think, nine or ten times in the proposed rule, and then, indeed, in the first paragraph, this animal is found in only one small location in Kern County. And then their own status review comes in and says, gee, that's wrong. We found it in several other places and- In Kern County. In Kern County. And, by the way, there are other locations where we think it may be found. And the status review said, and we're also discovering that the animal can exist in areas that we didn't think it could exist, in particular, in farming areas. The proposed rule said it can exist in what was referred to as actively farmed ground. The status review comes in and says, we're finding the species in actively farmed areas. So those were two pieces of critical information that was not known. But putting aside finding it in a few locations, it's not simply that finding. It's the status review's conclusion that the taxonomic designation of this subspecies is highly questionable. It is the Maldonado morphological study, which says, no, we really can identify subspecies on the basis of physical characteristics. And it's the genetic study. Now, we have a disagreement with the government about the interpretation of the genetic study. But it's not, for purposes of this proceeding, it's not important whether we're right or the government's right in terms of the interpretation of the genetic study. What's important is the public never had an opportunity to review that genetic study. Dr. Maldonado did conclude that the ornate shrew is one of the most threatened small mammals in California? Dr. Maldonado did reach that conclusion, and the services cited information suggesting that he peer-reviewed the final rule and, in fact, endorsed the listing. I think it's beside the point what his opinion was with regard to the ultimate regulatory decision. We didn't have an opportunity in the context of this rulemaking proceeding to contest that opinion. We proffered testimony at the district court, which was rejected in our attempt to augment the administrative record, by two experts that reached an opposite conclusion. And I would cite to Your Honor the fact that the services' own expert reached an opposite conclusion. So it's not simply our experts that said this animal's likely not endangered. The services' own expert reached that conclusion. I guess this is where I was sort of heading before. Much of your argument strikes me as a substantive argument rather than a procedural argument. And I gather the reason that you're highlighting, because the substantive argument doesn't make any difference at this point, is to show that there was some prejudice from the failure to comment. Well, I... Or failure to provide the opportunity to comment. We are making simply the procedural argument. I understand. Most of your argument, but a great deal of your argument is directed to criticism of the final rule. And the point of that, Your Honor, is the point is to highlight the fact that this was important or critical new information. The fact that the morphological study came in and said, no, we really can't identify this subspecies on the basis of physical characteristics, that there's this brand new genetic study. That's why we've highlighted those substantive issues, because, as Your Honor knows, under the Rybacek exception to the general rule, one of the standards is, yes, there's exception for information that merely confirms or supplements, and no prejudice is shown. Clearly, in this case, we've demonstrated prejudice because we've proffered testimony that was not admitted that would, we think, potentially alter the regulatory decision that was made here. Now, this issue of why these studies, these new studies, are important or critical new information is particularly important in the context of the Endangered Species Act. The Endangered Species Act is a statute that has a very tough regulatory regime. It has been described by various folks as the pit bull of the federal environmental statutes. Unlike an awful lot of federal environmental law, it doesn't allow any consideration of economics at the stage of the listing decision. Listing decisions under the statute are to be based solely on the basis of and the determinants in the statute are the best scientific data available. Congress amended the Endangered Species Act in 78, 79, 1982 in response to very substantial concerns that the then existing regulatory process was not adequate, that listings were being made on the basis of inadequate science, that there was not an Congress went beyond the requirements of the Endangered Species Act or the Administrative Procedure Act to impose additional procedural requirements. Our argument is that the service is not in a position to decide what is the best scientific data available, a critical decision under the Endangered Species Act, if the public has not had an opportunity to review and comment on that information. They're simply not in a position. Now, the service in its response to arguments has said, well, the information came in, we looked at it, it really didn't change our view, aside from the fact that we have a hard time understanding the logic of that argument, given the service's own status review said the animal's not endangered. But they essentially said, we don't think the information is a big deal. If that is the law, then any agency, when any new information comes in, can say, oh, that information really isn't important. We really didn't think that that was truly important information. But in this case, all you have to do is go to the final rule and look at the number of times that they cite the Maldonado studies, look at the fact that they specifically rely upon the genetic study, which they really have to rely on the genetic study now to support the subspecies designation, because they have to acknowledge that the morphological studies demonstrate that you can't identify the subspecies on the basis of morphological characteristics. So this is a circumstance where, really, all you have to do is look at the proposed rule, look at the changes that were made at the time of the final rule, and conclude the service clearly was relying on this new information. They thought it was important, critical new information, but the public simply didn't have an opportunity to review it. Your Honor, I think I would like to reserve the balance of my time for rebuttal. You certainly may. Thank you very much for your argument. Counsel? Good morning. May it please the Court. Matthew Sanders for the Federal Appellees. Sitting with me at counsel's table is Jim Monroe of the Interior Solicitor's Office. The APA's public notice and comment requirements are designed to ensure that the public has adequate notice of the issues that are on the table, that is, the issues that are going to be important to the agency's final decision. In this case, the service issued a proposed rule that clearly identified the issues that would be important to its final rulemaking, namely the taxonomy, range, and distribution of the Buena Vista Lake or BVL shrew. The plaintiffs provided extensive comments on precisely those issues. Then when these three additional studies came out, the two Maldonado studies and the status review, the service incorporated their findings in the final rule to give that rule a more accurate foundation. The service did not ignore the studies, nor did it use the studies to change the basis for its decision or the decision itself. The plaintiffs cannot show that they have suffered any prejudice from the rulemaking process in this case. They cannot show, and have not shown, that they would have been able to offer comments on these studies that would have persuaded the agency to modify its decision, nor do they allege that the underlying data in those studies is defective or unreliable. To directly deal with the plaintiff's characterizations of the Maldonado studies and the status review, and I think your point, Judge Thomas, is well taken, the plaintiff's real beef here is a substantive one, and that is they are disagreeing with the service's interpretation in its expertise, scientific and regulatory expertise, of what these studies mean and the role that they should play in the decision-making process. The status review, yes, the authors concluded that the BVL shrew is not endangered, but if you look at the information underlying that conclusion, you realize that the service rightly interpreted the status review. All of the information in that review supported the service's initial findings in the proposed rule that the BVL shrew is severely threatened. Everyone here agreed that the BVL shrew is in peril, and everyone agreed that there are significant threats and agreed about what those threats are that have resulted in that peril. The status review authors thought that voluntary conservation measures based on the limited information before them would be sufficient to ensure the protection of the shrew, but the service, in its own expertise and based on much more information, concluded that those voluntary conservation measures had not been successful in the past and were not likely to be implemented in the future, and that listing was the best, indeed the only, mechanism for adequately protecting the shrew. As for the two Maldonado studies, the morphological study found that while there aren't huge differences between ornate shrew subspecies, 16 of 17 morphological variables found that there are scientifically measurable and scientifically distinct and significant difference between seven differences between seven ornate shrew subspecies, particularly the BVL shrew. The 2001 genetic study didn't in any way contradict the taxonomic classification of the BVL shrew, but all of the evidence in those studies supported the service's findings in the initial rule, in the proposed rule. Well, doesn't this really come down to how, I mean, and unfortunately we're put in the position of deciding whether or not what you chose to view as critical or important. I mean, there is some force to the argument that if you're citing the Maldonado studies and others to that extent in the final report, then it must have meant something to the agency, and in that case, perhaps public comment should have been warranted. Your view, I take it, is just that that's supplemental information. It's very hard, sitting where we are, to discern the difference, I think. I imagine that it is, especially when it's based on scientific studies in a case like this. But the law is that under the APA, an agency has to provide notice, a public comment period for information that is critical to an agency's decision and results in some sort of change in the agency's decision. Does it? Are you sure about that? I mean, if it doesn't, even if it doesn't result in change. Well, it might be possible that information could be so significant, so critical to an agency's rule, that really the agency should have submitted that information to public comment. But that certainly isn't the case here. Here, the information in the studies was merely supplemental. It supported the same decision that the agency had proposed to take. And the plaintiffs provided comments on precisely the issues that the studies addressed. I take it that where the rubber meets the road between what the service wants to do and the interest of these plaintiffs is agricultural development? That's correct. The DVL-SHRU lists primarily in riparian habitat, which depends upon securing adequate water supplies and upon protecting certain areas of habitat. And in the Southern Central California Valley, agricultural practices have eliminated 95% of this year's potential suitable habitat. That's correct. Is counsel correct in saying that some of the later studies indicated that the SHRUs, these particular SHRUs, could peacefully coexist, if that's the right word, in agriculturally developed areas? Well, if you read the status review carefully, I believe that counsel is talking about two observations in that review. One is that ornate SHRUs generally, not BVL SHRUs, based upon one study, may be able to live in more actively irrigated and cultivated lands. Again, that was based upon one study of unknown significance and did not concern BVL SHRUs in particular. The second is the observation in the status review, a supposition really, that BVL SHRUs may be able to exist in more arid upland communities. But the status review authors are very clear that even if that's the case, there are likely very few that would live in those conditions. The status review found only 16 additional SHRUs. And counsel is right that it was not a population census. But nonetheless, in its survey found only 16 additional SHRUs, concluded that there are only 10 degraded, scattered fragments of habitat left, and that the BVL SHRUs survival depends upon the protection of these habitats and the reconnection of these habitat fragments. And again, the service concluded, based on the information before it and its own expertise, that the only way to ensure that those things would occur would be to list the species as endangered. The effect of which, as a practical matter, means that the sites where they live and roost and et cetera can't be disturbed by agricultural development. That's right. If you look at where they're known to exist now. Yes, isn't it? Yes. If you look at where they're known to exist now, they list, for example, the current National Wildlife Refuge, which is protected from such practices. Isn't that an important motivating factor, rationale, if you will, for listing of the SHRU to stop what the service saw as the destruction of habitat? Yes, absolutely. Well, then why wouldn't it be critical to that decision that post the listing that one or more experts said that they had found that SHRUs could peacefully coexist with agriculturally developed land? Well, again. Why wouldn't that be critical? I mean, if it was critical to the reason for the listing to put a halt to the destruction of habitat, why wouldn't the fact that some SHRUs, perhaps even including the BVLs, could peacefully coexist with agriculturally improved land? Well, again, the evidence before the service in the status review was that all BVL SHRUs known to exist existed on degraded habitat in which there weren't agricultural practices occurring, and that the only way to ensure the SHRU's survival was to make sure that additional habitat areas were secured and that the existing habitat fragments were connected. The information before the service in the status review and the other information that is cited in the proposed rule and had before it showed that, in fact, the BVL SHRU was believed to exist only in certain areas, and there was no information in the status review that contradicted it. Again, the service concluded, for example, at supplemental excerpts of a record, page 13, the main service biologist said, quote, the data in the status review does not support this conclusion that the BVL SHRU is not endangered. Therefore, I'm not sure why they said anything along these lines. Again, all of the information in the status review supported the findings in the proposed rule regarding the condition, the current condition of the SHRU and the threats facing the SHRU, ranging from almost complete loss of suitable habitat to poisoning from pesticides. Nothing in the status review undermined the service's conclusions. And the other point I would make is that the status review addressed range distribution and, vaguely, taxonomy of the BVL SHRU. The plaintiffs provided extensive comments on precisely those issues. If you look at excerpts, supplemental excerpts of record, pages 30 to 31, 33, 34 to 36, and 39, the plaintiffs go on at length about their criticisms of the proposed rule's findings regarding the taxonomy and range of the SHRU. There's no evidence in the record. There's no reason to believe that the plaintiffs would have been able to provide sufficiently different comments based on the information in the status review that would have been able to persuade the service to modify its rule. They simply would have provided more of the same. The only other point I'd like to make is that it simply can't be the case that the service cannot decide what constitutes the best available science without submitting all of that information to the public. That would render agency rulemaking unworkable. Presumably, under that rule, the agency would have to submit public comments for public comment, comment upon comment. The service is a regulatory agency charged with making these decisions in its scientific and regulatory and management expertise. And certainly, the evidence here shows that the service undertook its rulemaking process in a rational way, considered all of the evidence, considered all of the comments, and made rational decisions and provided an articulate, rational explanation in the final rule for why this SHRU needed to be listed as endangered. Thank you. Roberts. Thank you for your argument. We always appreciate it when you leave a little time on the clock. Thank you. Rebuttal. Your Honor, counsel has made the point that we raised issues and comments with regard to the taxonomic status at the time of the proposed rule. We certainly did. And we noted the paucity of information in the record. I would refer we submitted requests for the information that the service was relying upon the record. What we got back were two pages of handwritten notes based on telephone conversations. One is excerpts of Record 642. The other is excerpts of Record 643. That was the sum and substance of the information included in the record regarding discussions with Dr. Maldonado. None of the data was available. So we didn't have an opportunity to review the data. So for the government to suggest that we had a full and fair opportunity to provide comments and to participate in this rulemaking process when all of this data was hidden from public review is simply not accurate. Secondly, with regard to their continued assertion that somehow the status review merely supplements the agency's conclusion here, when the status review itself said, we have concluded that this animal is not now endangered, nor is it likely to be endangered in the future. There's no common sense way that that conclusion can be characterized as merely confirming and supplementing the service's proposed rule. Now let me read to you, Your Honor, from an email that was sent by the author of the status review, Dr. Williams, to Dwight Harvey, and this is at excerpts of Record 641. The date is not shown on this. No, I'm sorry, it is. October 26, 2000. So around about the same time that the service was closing the comment period, before the status review became publicly known. This is what Dr. Williams says. Of considerable importance in considering this shrew's status is that we caught ten Sorex ornatus, that's the Latin name for ornate shrew, on recently fallowed irrigated land in the Minota area of Fresno County. He goes on to say, this land was previously was used to grow mostly cotton and probably less often tomatoes and alfalfa or melons. Okay, then Dr. Williams goes on to say, this raises the issue of are these relic populations actually isolated and relictual? Question mark, close quote. Then he goes on to say, Dr. Williams goes on to say, however, based on the little we know, I think it would be prudent to postpone listing decisions until more information can be gathered and assimilated. Our report should be completed and finalized in another four to six weeks. This is a year and a half before the final rule was published. This is the information that the service had that they did not make available. They closed the comment period in the face of this kind of uncertainty. That's a violation of the Administrative Procedure Act. Now, again, with regard to the other comments in the status review, on excerpts of record, page 737, this is from the status review. Again, the government's point, gee, the status review merely confirmed our assertions in the proposed rule. This is what the status review says. Current taxonomy does not reflect phylogenetic nor geographic relationships of ornate shrews, citing Maldonado et al., 2001. Until structural analyses are performed and coupled with genetic and geographic information, the taxonomic identity of Ornata's group shrews must be considered unsettled. So here we have a status review, which I believe the record indicates was made available to the service fully a year before the final review was published. Their own experts are saying the taxonomic status of this subspecies is unsettled. There was plenty of opportunity to reopen the comment period. It's entirely speculative on the government to suggest that we could not make a showing that would go to the substance of this rulemaking. And I would suggest that's not the law. We don't have to make a showing to demonstrate a violation of the APA, that it would change the agency's decision. That's not the law in this circuit. All we have to demonstrate is that this is important information. Indeed, in the leading case. Critical information. Critical information. I'm sorry, Your Honor. In the leading case of this court, Idaho Farm Bureau, it was information that supported the agency's decision, and yet this court said, no, that was important information that the public had to have an opportunity to review and comment. In the Ober case that we've cited, this court said that the responses that were provided by the State of Arizona to the Environmental Protection Agency was information that had to be made available for public review and comment, even though the EPA relied on those responses by the State of Arizona in that regulatory decision. So counsel's just wrong with regards to law here. We do not have to make a showing that the proffered testimony would, in fact, change the agency's mind, because it would really render a nullity, the rulemaking process, if an agency can engage in the kind of behavior that was engaged in here to not disclose the existence of the status review, to have email traffic that was not disclosed to the public that can be fairly characterized as saying, don't give us that information from Mr. Harvey to Dr. Maldonado. Don't send in your study until after we publish the final rule, because then we're open to Freedom of Information Act requests. That kind of behavior, Your Honor, is not consonant with the requirements of the Administrative Procedure Act. Thank you, Your Honor. Any other questions? I don't see any. Thank you for your argument. Thank both sides for their argument. Very interesting and complex case. We'll take it under advisement, submit it for decision, and we'll stand in recess for the day. All rise. Thank you. Thank you.
judges: Wallace, Hawkins, Thomas